25CA1332 North Wasatch v Boulder 07-23-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 25CA1332
Boulder County District Court No. 23CV30674
Honorable Judith L. LaBuda, Judge

North Wasatch Farm LLC, a Colorado limited liability company; and Miguel
Cerceda-Frayre,

Plaintiffs-Appellants,

v.

The County of Boulder, State of Colorado; The Board of County Commissioners
for the County of Boulder, Colorado; Claire Levy, in her capacity as a member
of the Board of County Commissioners of Boulder County; Marta Loachamin,
in her capacity as a member of the Board of County Commissioners of Boulder
County; Ashley Stolzmann, in her capacity as a member of the Board of County
Commissioners of Boulder County; and Dale Case, in his capacity as Director
of Boulder County Community Planning and Permitting Department,

Defendants-Appellees.

---

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE SULLIVAN
Pawar and Meirink, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 23, 2026

---

Ed Byrne, P.C., Edward R. Byrne, Boulder, Colorado; Prescott, Rodriguez,
Ostrander, Wallshein & Taylor, P.C., Richard F. Rodriguez, Englewood,
Colorado, for Plaintiffs-Appellants

Ben Pearlman, County Attorney, David Hughes, Deputy County Attorney, Erica
Rogers, Assistant County Attorney, Boulder, Colorado, for Defendants-
Appellees

¶ 1    In this C.R.C.P. 106(a)(4) action, plaintiffs, North Wasatch Farm LLC and Miguel Cerceda-Frayre, appeal the district court's order upholding the decision of defendant, the Board of County Commissioners for Boulder County (the Board), denying their request for a modification of their subdivision exemption.[1]  We affirm.

## I.    Background

¶ 2    Cerceda-Frayre owns and operates North Wasatch Farm on a thirty-two-acre parcel in unincorporated Boulder County.  He employs regenerative farming practices on the parcel, including repurposing food waste to feed farm animals, using holistic land use practices to replenish soil and sequester carbon, and producing food that is provided to local food banks.

¶ 3    Cerceda-Frayre's parcel was originally part of a larger thirty-five-acre lot, which met the zoning district's minimum of thirty-five acres to constitute a legal building lot.  In 1989, however,

---

[1] In addition to naming the Board, plaintiffs sued the County of Boulder; Claire Levy, Marta Loachamin, and Ashley Stolzmann in their capacities as members of the Board; and Dale Case in his capacity as the director of community planning and development for Boulder County.  We refer to these parties and the Board collectively as "defendants."

the prior owners illegally subdivided the lot. The other three-acre portion of the original lot contains a residence and is now owned by the Wilkins family. Cerceda-Frayre's parcel, by contrast, has no residence.

## A. Initial Application and Hearing

¶ 4 In 2018, Cerceda-Frayre and the Wilkinses submitted a joint application to the county for a subdivision exemption to recognize both lots as legal building lots. In the narrative submitted with their application, Cerceda-Frayre and the Wilkinses described how owners of neighboring parcels that were smaller than thirty-five acres had previously used the Nonurban Planned Unit Development (NUPUD) process in the Boulder County Land Use Code (BCLUC) to obtain subdivision exemptions. Although Cerceda-Frayre and the Wilkinses were technically ineligible for the NUPUD process because their lots had changed ownership after 1994, *see* BCLUC § 6-400(B)(1)(d) (updated May 11, 2023),[2] their application sought to "accomplish the same objectives." As part of their attempt to

---

[2] The BCLUC has since been amended. Throughout this opinion, we cite the version relied on by the district court when addressing plaintiffs' C.R.C.P. 106(a)(4) complaint.

incorporate the NUPUD requirements, the applicants proposed that seventy-five percent of Cerceda-Frayre's land would become an "agricultural outlot," similar to those preserved by a conservation easement on neighboring properties with subdivision exemptions.[3] *See* BCLUC § 6-400(B) (listing NUPUD requirements).

¶ 5      The county community planning staff recommended denying the application because it failed to meet the criteria for subdivision exemptions in BCLUC section 9-400(A).  As relevant here, BCLUC section 9-400(A)(1) requires the Board to deny any application for a subdivision exemption that would increase the number of currently existing lots unless the identified land use impacts associated with the increase are "sufficiently mitigated."  The staff found that the applicants' proposal increased the number of currently existing lots from one to two because their respective parcels weren't "legal building lots per the [BCLUC]."  The staff also determined that the land use impacts of an additional unit of density weren't sufficiently mitigated.

---

[3] An outlot is "[a] designated portion of subdivided land which, unless otherwise noted on the plat, is not a building lot."  BCLUC § 18-182.

¶ 6    During the Board's initial hearing in July 2019, plaintiffs' representative proposed the idea of a conservation easement to preserve the "agricultural purpose and use" of the land while also "mitigating the impacts." The Board ended up tabling consideration of the application to explore whether a "strong" conservation easement with agriculture-related conditions on a dwelling unit might mitigate the land use impacts.

¶ 7    After visiting the site, the county's planning staff again recommended denying the application under BCLUC section 9-400(A)(1), finding that the proposal would add a unit of density and that the associated land use impacts still weren't sufficiently mitigated. However, the staff also suggested conditions of approval if the Board elected to grant the application, including use restrictions on the subject parcels.

¶ 8    After a second public hearing in October 2019, the Board granted the application with conditions. Among other conditions, the Board required Cerceda-Frayre to grant a conservation easement over his parcel to the county to preserve its agricultural values. As part of the easement, current and future owners would be required to engage in the same regenerative agricultural farming

4

practices that Cerceda-Frayre already employed on the property. The Board's resolution also said that Cerceda-Frayre's residential use was "accessory" to the parcel's agricultural use, which meant that any residence must be "removed or decommissioned" if the agricultural use of the property ever ceased.

### B. Subsequent Applications and Hearings

¶ 9 In 2020, before all the Board's conditions could take effect, Cerceda-Frayre asked to remove or modify several of the conditions, including removing the required conservation easement and the accessory designation for the parcel's residential use. Although the county's planning staff recommended modifying several conditions, they recommended rejecting any removal of the conservation easement or the accessory designation. The Board adopted the staff's recommendations in June 2021.

¶ 10 In 2022, again before all the Board's conditions were put in place, Cerceda-Frayre asked a second time to remove the accessory designation for the parcel's residential use. He also requested that the Board replace the conservation easement with a restrictive covenant. The county's planning staff determined that a restrictive covenant could meet the purposes of the existing conservation

5

easement and therefore recommended approving that modification, but they recommended rejecting any change to the accessory designation for the parcel's residential use. After an August 2023 public hearing, the Board rejected both of Cerceda-Frayre's requested modifications. In doing so, the Board expressed concern that the county would have less certainty and predictability enforcing the conditions of use if it replaced the conservation easement with a restrictive covenant.

## C. District Court Proceedings

¶ 11 Plaintiffs then filed a complaint for judicial review under C.R.C.P. 106(a)(4). Their operative complaint asserted that (1) the Board had exceeded its jurisdiction and abused its discretion by attaching conditions to its approval of the subdivision exemption application; (2) the Board's conditions amounted to an unconstitutional taking; and (3) plaintiffs were entitled to mandamus relief.

¶ 12 In a detailed written order, the district court denied plaintiffs' requested relief. After noting the deferential standard of review that applies under C.R.C.P. 106(a)(4), the court determined that the Board had broad authority to impose its conditions of approval

6

under the applicable provisions of the BCLUC.  The court similarly rejected plaintiffs' takings claim, explaining that plaintiffs didn't relinquish any portion or use of the land that existed when Cerceda-Frayre purchased the property.  Finally, the court concluded that plaintiffs hadn't satisfied the required elements for mandamus relief.

## II.    C.R.C.P.  106(a)(4)

¶ 13     On appeal, plaintiffs reraise their contention that the Board exceeded its jurisdiction and abused its discretion by attaching conditions to its subdivision exemption approval.  They also contend that the Board erred by requiring a "community benefit" in

the form of continual regenerative farming on the land.[4]  We

address and reject both contentions in turn.

### A.  Standard of Review and Applicable Law

¶ 14    When reviewing an administrative decision under

C.R.C.P. 106(a)(4), we sit in the same position as the district court.

*Langer v. Bd. of Comm'rs*, 2020 CO 31, ¶ 12.  Our review is limited

to determining whether the governmental body or officer exceeded

its jurisdiction or abused its discretion based on the evidence in the

record before the defendant body or officer.  C.R.C.P. 106(a)(4)(I);

*Langer*, ¶ 12.

---

[4] In the district court, defendants challenged the timeliness of plaintiffs' 2023 complaint, arguing it was a belated attempt to overturn the Board's original 2019 resolution imposing conditions. The district court rejected defendants' argument, concluding that the Board had reconsidered and modified its original decision in the 2021 and 2023 resolutions.  *See Citizens for Responsible Growth v. RCI Dev. Partners, Inc.*, 252 P.3d 1104, 1107 (Colo. 2011) (when a quasi-judicial decision is reconsidered, "the earlier decision ceases to be final, and it is the superseding decision that ultimately ends the action and is subject to judicial review").  Defendants don't challenge the court's decision in their answer brief on appeal, nor do we perceive any error with its reasoning.  *See Brown v. Walker Com., Inc.*, 2022 CO 57, ¶ 42 (C.R.C.P. 106(b)'s filing deadline is jurisdictional); *Smith v. City & County of Denver*, 2025 COA 70, ¶ 12 (explaining that "we have an independent duty to ensure that limits on our jurisdiction are observed").

¶ 15    A governmental body abuses its discretion "only when it applies an erroneous legal standard or when no competent evidence in the record supports its ultimate decision." *Langer*, ¶ 13.  We will conclude that no competent evidence supported an administrative decision only if the decision was "so devoid of evidentiary support that it can only be explained as an arbitrary and capricious exercise of authority."  *Id.* (quoting *Freedom Colo. Info., Inc. v. El Paso Cnty. Sheriff's Dep't,* 196 P.3d 892, 900 (Colo. 2008)).

¶ 16    Colorado law provides local governments with broad authority to regulate land use within their respective jurisdictions.  *See, e.g., Wilkinson v. Bd. of Cnty. Comm'rs*, 872 P.2d 1269, 1276 (Colo. App. 1993).  A county's land use regulation authority includes, for example, the authority to make a zoning plan for unincorporated areas within the county.  § 30-28-111(1), C.R.S. 2025.  The zoning plan may regulate, among other things,

> the location, height, bulk, and size of buildings and other structures, [the] percentage of lot[s] which may be occupied, the size of lots, courts, and other open spaces, the density and distribution of population, the location and use of buildings and structures for trade, industry, residence, recreation, public activities, or other purposes, access to sunlight for solar energy

> devices, and the uses of land for trade, industry, recreation, or other purposes.

*Id.*; *see also* §§ 29-20-101 to -112, C.R.S. 2025 (Local Government Land Use Control Enabling Act).

¶ 17     In Boulder County, the BCLUC sets forth criteria for approving a subdivision exemption request. *See* BCLUC §§ 9-201, 9-400(A). As mentioned, one such criterion lives in BCLUC section 9-400(A)(1). Under that provision, when the requested exemption would result in an increase in the number of currently existing lots, any identified land use impacts associated with the increase must be "sufficiently mitigated." BCLUC § 9-400(A)(1).

¶ 18     If a subdivision exemption application doesn't meet all listed criteria for approval, the Board may, in its discretion, impose reasonable conditions that allow the proposal to meet the criteria. BCLUC § 9-500(A). As relevant here, those conditions may include but aren't limited to the following: designating preserved areas of land; requiring management practices to maintain preserved land, protect environmental resources, minimize erosion, control or eliminate noxious weeds or undesirable plants, regulate drainage, and prevent hazards both on and off the subject property; and

10

requiring the landowner to grant a conservation easement or restrictive covenant running with the land to preserve, and avoid the over-intensive use of, sites with recognized conservation and open land values.  BCLUC § 9-500(A)(1).

### B.    Analysis

#### 1.    Imposition of Conditions

¶ 19    Plaintiffs contend that the Board exceeded its jurisdiction and abused its discretion by imposing conditions on its subdivision exemption approval, arguing that BCLUC section 9-500(A) was never triggered because the Board never found that plaintiffs failed to meet the listed criteria for approval.  Plaintiffs also contend that no record evidence supported the Board's decision to apply the "sufficiently mitigated" criterion in BCLUC section 9-400(A)(1).[5]

¶ 20    At the outset, we conclude that the Board had authority to attach conditions to its approval of plaintiffs' subdivision exemption application.  The county planning staff explained that the two subject parcels weren't currently "legal building lots" under the

---

[5] Although plaintiffs also challenge other criteria that they say the Board relied on to attach conditions, the Board defends its actions under only the "sufficiently mitigated" criterion in BCLUC section 9-400(A)(1).

code, so recognizing them as such would increase the number of existing legal lots from one to two.  The staff also determined that plaintiffs' application didn't sufficiently mitigate the land use impacts caused by an additional unit of density, contrary to BCLUC section 9-400(A)(1).  Thus, because the evidence supported a finding that plaintiffs' application didn't meet the criteria for a subdivision exemption, the Board had broad authority to attach conditions to its approval.  *See* BCLUC § 9-500(A)(1).

¶ 21    We aren't persuaded otherwise by plaintiffs' argument that the Board never found that they failed to meet the listed criteria for approval, thereby precluding the Board from attaching conditions under BCLUC section 9-500(A)(1).  The Board's 2019 resolution approving plaintiffs' application discussed the staff's finding that plaintiffs' application failed to meet the criteria for a subdivision exemption under BCLUC section 9-400.  And just a few sentences later, the Board laid out its conditions for approving plaintiffs' application.  From this, we can fairly infer that the Board agreed with the staff's finding that plaintiffs' submitted application didn't meet the criteria for approval under BCLUC section 9-400.  *See Sundance Hills Homeowners Ass'n v. Bd. of Cnty. Comm'rs*, 534

P.2d 1212, 1216 (Colo. 1975) (express findings aren't required if the necessary findings can be implied from the action taken); *accord No Laporte Gravel Corp. v. Bd. of Cnty. Comm'rs*, 2022 COA 6M, ¶¶ 84-86.

¶ 22 We also conclude that the record supported the Board's decision to apply the "sufficiently mitigated" criterion in BCLUC section 9-400(A)(1). The Board heard testimony from the county's land use director about past "fragmentation" of the county's agricultural lands, the county's efforts to curb that practice, and concerns that granting plaintiffs' application could incentivize and create precedent for backpedaling from those efforts. A Board member also expressed concern that future owners might simply "live" on the land and discontinue Cerceda-Frayre's agricultural practices, leading to "noxious weeds." In addition, after touting the benefits of plaintiffs' regenerative farming practices, plaintiffs' representative testified at the July 2019 hearing that a conservation easement would provide "preservation of the agricultural purpose and use" while also "mitigating the impacts."

¶ 23 Given all this, the Board could have reasonably determined that requiring plaintiffs and their successors to continue specified

13

agricultural uses on the property would help mitigate the identified land use impacts. *See* BCLUC § 9-500(A)(1) (identifying land management practices and control of noxious weeds as permissible conditions of approval).

¶ 24    To the extent plaintiffs present countervailing considerations, it was for the Board, not this court, to weigh the evidence and resolve any conflicts.[6] *See Stor-N-Lock Partners #15, LLC v. City of Thornton*, 2018 COA 65, ¶ 33. As a result, we can't say that the Board abused its discretion by applying the "sufficiently mitigated" criterion in BCLUC section 9-400(A)(1). *See Langer*, ¶¶ 12-13.

¶ 25    The record also supports the Board's 2023 decision declining to remove the conditions it had previously imposed. During the 2023 hearing, the Board expressed familiarity with the prior proceedings and found that no new evidence justified removing the

---

[6] Among other countervailing considerations, plaintiffs argue that BCLUC section 4-502(D)(5)(c) permits a single-family dwelling when occupied by the owner or manager of a farm, thus confirming that such dwellings don't constitute a land use impact requiring mitigation. But as the Board correctly points out, that provision requires the dwelling be located on a "building lot[]," which plaintiffs' parcel lacked. We aren't convinced otherwise by plaintiffs' citation to inapplicable code provisions that predated their subdivision exemption application.

conditions. The Board also worried that there would be less certainty and predictability in enforcing the conditions of its approval if it replaced the conservation easement with a restrictive covenant. *See* § 38-30.5-108, C.R.S. 2025 (discussing enforcement remedies for conservation easements). Under these circumstances, the Board didn't abuse its discretion by denying plaintiffs' request to remove its conditions of approval. *See E-470 Pub. Highway Auth. v. Revenig,* 140 P.3d 227, 230-31 (Colo. App. 2006) (Under the abuse of discretion standard, we ask "not whether we would have reached a different result but, rather, whether the trial court's decision fell within a range of reasonable options.").

## 2. Community Benefit

¶ 26 As we understand their argument, plaintiffs contend that the Board abused its discretion by requiring them to continue providing a "community benefit" — regenerative farming — as a condition for building on the land.

¶ 27 Based on the record of the proceedings already discussed, we conclude that ample evidence in the record confirms that the Board attached conditions to its subdivision exemption approval under BCLUC sections 9-400(A)(1) and 9-500(A)(1), not a community

15

benefit standard. Although certain Board members and witnesses (including plaintiffs' own representative) mentioned the notion of a "community benefit" at different points during the October 2019 hearing, the Board ultimately recognized plaintiffs' regenerative farming as a positive factor that helped mitigate the land use impacts of an additional unit of density. Under the BCLUC, this wasn't an abuse of discretion. *See* BCLUC §§ 9-400(A)(1), 9-500(A)(1).

### III. Takings Clause

¶ 28     Next, plaintiffs contend that the Board violated the federal Takings Clause by attaching conditions to its approval of their requested subdivision exemption.[7] We disagree.

---

[7] Plaintiffs briefly mention Colorado's counterpart to the federal clause, Colo. Const. art. II, § 15, but they don't develop any argument under it. We therefore don't address whether plaintiffs are entitled to relief under Colorado's takings clause. *See In re Marriage of Zander*, 2019 COA 149, ¶ 27 (we will not consider an argument unsupported by legal authority or any meaningful legal analysis), *aff'd*, 2021 CO 12.

## A. Applicable Law and Standard of Review

¶ 29 The Takings Clause, found in the Fifth Amendment to the United States Constitution, provides as follows: "nor shall private property be taken for public use, without just compensation."

¶ 30 The Takings Clause's just compensation requirement saves individual property owners from bearing public burdens that, in all fairness, ought to be borne by the public as a whole. *Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 273-74 (2024). But a government's land use restriction that is reasonably necessary to effectuate a substantial government purpose isn't a taking unless it saps too much of the property's value or frustrates the owner's investment-backed expectations. *Id.* at 274. Indeed, if a government can deny a building permit to advance a legitimate police power purpose, it may also place conditions on the permit to further that purpose. *Id.*

¶ 31 Plaintiffs' core takings argument is rooted in two United States Supreme Court cases: *Nollan v. California Coastal Commission,* 483 U.S. 825 (1987), and *Dolan v. City of Tigard*, 512 U.S. 374 (1994). Under those cases, the government must pay just compensation when it conditions a building permit on the landowner relinquishing

17

property or paying a monetary fee unless the conditions (1) have an essential nexus to the government's land use interest and (2) are roughly proportional to the development's impact on the land use interest. *Sheetz*, 601 U.S. at 275-76 (first citing *Nollan*, 483 U.S. at 837; and then citing *Dolan*, 512 U.S. at 391).

¶ 32    We review takings claims de novo. *G & A Land, LLC v. City of Brighton*, 233 P.3d 701, 706 (Colo. App. 2010).

## B.    Analysis

¶ 33    Although the district court determined that the Board's decision satisfied *Nollan* and *Dolan*, it also questioned whether the two-part *Nollan/Dolan* framework properly applies at all. It reasoned that plaintiffs have "lost no rights" because the Board's decision didn't "deprive [p]laintiffs of any use of their property that existed when they purchased the property in 2017." For their part, defendants argue that the *Nollan/Dolan* framework is inapplicable for a different reason. They assert that, unlike the permanent, public dedications of private property that the regulatory bodies required in *Nollan* and *Dolan*, the Board imposed no such condition on plaintiffs in this case.

18

¶ 34    We need not resolve the parties' competing arguments over whether the *Nollan*/*Dolan* framework properly applies in this exact factual scenario. Even assuming without deciding that it does, we agree with the district court that the Board's decision satisfies the two-part framework.

¶ 35    First, the conditions imposed by the Board bore an essential nexus to the county's land use interests. *See Nollan*, 483 U.S. at 837. Conditioning plaintiffs' residential building on continued regenerative farming furthered the land use interests that the Board and county staff repeatedly identified — preserving the agricultural character of the area and mitigating the impacts of additional density.

¶ 36    Second, the conditions were roughly proportional to the development's impacts on the county's land use interests. *See Dolan*, 512 U.S. at 391. Given the increased fragmentation of agricultural parcels in the area and the county's interests in preserving the area's agricultural character and minimizing the impacts of additional density, the Board's decision requiring continued regenerative farming offset, with rough proportionality,

the adverse impacts from plaintiffs' additional development.[8]  *See id.* ("No precise mathematical calculation is required . . . .").

¶ 37    Accordingly, the district court didn't err by rejecting plaintiffs' takings claim.

## IV.    Mandamus Relief

¶ 38    Finally, plaintiffs contend the district court erred by denying their request for mandamus relief.  We aren't persuaded.

¶ 39    Mandamus under C.R.C.P. 106(a)(2) is an "extraordinary remedy" that compels public officials to perform ministerial duties they owe by virtue of their offices.  *Owens v. Carlson,* 2022 CO 33, ¶ 21.  A person seeking mandamus relief bears the burden of showing that (1) the person has a clear right to the relief sought; (2) the party sued has a clear duty to perform the act requested; and (3) no other remedy is available.  *Id.*

¶ 40    We conclude that plaintiffs haven't established the first two elements.  Under the BCLUC, plaintiffs had no clear right to a

---

[8] Plaintiffs also contend that the district court erred by not conducting an "ad hoc factual inquiry" under *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 124 (1978). But plaintiffs didn't make this argument before the district court, and we don't consider constitutional arguments raised for the first time on appeal.  *See McGihon v. Cave,* 2016 COA 78, ¶ 16.

subdivision exemption free from conditions, and the Board had no clear duty to grant such an exemption. *Cf. City of Colorado Springs v. SecurCare Self Storage, Inc.*, 10 P.3d 1244, 1249-50 (Colo. 2000) (explaining that the city had discretion to deny permitted use when the plain language of the zoning code didn't establish an absolute right to such development). As the district court explained, the Board reached its discretionary decision to attach conditions to its approval after "considerable deliberation," the opposite of a purely ministerial duty. *See Owens*, ¶ 21.

¶ 41    Accordingly, we perceive no error in the district court's denial of plaintiffs' mandamus claim.

V.    Disposition

¶ 42    We affirm the judgment.

JUDGE PAWAR and JUDGE MEIRINK concur.

21